# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RANDY MCLENDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  5:19-cv-00057-LCB-HNJ |
| | ) | |
| HANSER WHITFIELD, Lt., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The plaintiff, through counsel, filed an amended complaint seeking monetary damages or injunctive relief pursuant to 42 U.S.C. § 1983 for violations of his civil rights.  (Doc. 6).  The plaintiff names the following defendants in the amended complaint: Warden DeWayne Estes, Lieutenant Hanser Whitfield, and CO-1 Micah Donaldson.  (*Id.* at 1-2).  The plaintiff seeks compensatory and punitive damages, costs and attorney fees, and any other relief the court deems appropriate.  (*Id.* at 5).  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the amended complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

For the reasons that follow, the undersigned **RECOMMENDS** the court **GRANT** the motion for summary judgment filed by defendant Estes.  The undersigned **FURTHER RECOMMENDS** the court **GRANT** the motion for summary judgment filed by defendants Whitfield and Donaldson as to the plaintiff's claim of

deliberate indifference to his serious mental health needs and **DENY** it as to his claim of excessive force.  Finally, the undersigned **FURTHER RECOMMENDS** the court **REFER** the plaintiff's excessive force claims against defendants Whitfield and Donaldson to him for additional proceedings.

## I. Procedural History

On April 29, 2019, the undersigned entered an Order for Special Report directing the Clerk to forward copies of the amended complaint to each of the named defendants and directing the defendants to file a special report addressing the plaintiff's factual allegations.  (Doc. 13).  The undersigned advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*Id.*).

On June 28, 2019, the defendants filed a special report, supplemented by affidavits and/or other evidence.  (Doc. 15).  On July 1, 2019, the undersigned notified the parties that the court would construe the special report as a motion for summary judgment and notified the plaintiff that he had twenty-one (21) days to respond to the motion for summary judgment by filing affidavits or other material.  (Doc. 16).  The undersigned also advised the plaintiff of the consequences of any default or failure to comply with Federal Rule of Civil Procedure 56.  (*Id.*).  *See Griffith v. Wainwright*, 772

F.2d 822, 825 (11th Cir. 1985).  On August 15, 2019, the plaintiff filed a response, supplemented by affidavits and/or other evidence.  (Doc. 19).[1]

This matter now proceeds before the court on the defendants' motion for summary judgment and the response thereto.

## II. Standard of Review

Because the court has construed the defendants' special report as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the resolution of the motion.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.,* 929 F.2d

---

[1] In the "Procedural History" section of his opposition to the defendants' motion for summary judgment, the plaintiff proclaims "there was no discovery conducted prior to submitting the record for summary judgment;" *i.e.,* no Rule 26 conference or report, no paper discovery, and no depositions. (Doc. 19 at 3).  However, the Order for Special Report provided the plaintiff an opportunity to file a motion for leave to conduct additional discovery within 30 days of the certificate of service attached to the defendants' June 28, 2019, special report.  (Doc. 13 at 5-6; Doc. 15).  Though he had ample time to do so, the plaintiff never filed a motion for leave to conduct additional discovery prior to filing his August 15, 2019, opposition. (Doc. 19).  Furthermore, his opposition does not seek any specified discovery and therefore his blanket demand that the court "enter an order granting his motion for discovery" (*id.* at 12), is due to be DENIED.

604, 608 (11th Cir. 1991).   Unless the plaintiff, who carries the ultimate burden of

proving his action, is able to show some evidence with respect to each element of his

claim, all other issues of fact become immaterial, and the moving party is entitled to

judgment as a matter of law.   *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986);

*Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).   As the Eleventh Circuit has

explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to
> establish a prima facie case.  "In such a situation, there can be 'no genuine
> issue as to any material fact,' since a complete failure of proof concerning
> an essential element of the non-moving party's case necessarily renders all
> other facts immaterial." [citations omitted].    Thus, under such
> circumstances, the public official is entitled to judgment as a matter of law,
> because the plaintiff has failed to carry the burden of proof.  This rule
> facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

Stated differently,

> A genuine dispute of material fact exists when the nonmoving party
> produces evidence that would allow a reasonable factfinder to return a
> verdict   in   its   favor   such   that   summary   judgment   is   not
> warranted.  *Greenberg* [*v. BellSouth Telecommunications, Inc.*], 498 F.3d [1258]
> at 1263 [(11th Cir. 2007)]; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d
> 1306, 1313 (11th Cir. 2007).  "The mere existence of some factual dispute
> will not defeat summary judgment unless that factual dispute is material
> to an issue affecting the outcome of the case." *McCormick v. City of Fort
> Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).
> "[T]here must exist a conflict in substantial evidence to pose a jury
> question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301
> (M.D. Fla. 2011) (citation omitted).   "When opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *Richards v. Glover*, No. 2:16-CV-707-ALB, 2019 WL 2608366, at *2 (M.D. Ala. May 29, 2019), *report and recommendation adopted*, No. 2:16-CV-707-ALB, 2019 WL 2606931 (M.D. Ala. June 25, 2019).

## III. Analysis

### A.      Sovereign Immunity

To the extent the plaintiff sues for monetary damages against the defendants in their official capacities, his claims are due to be dismissed. A law "suit against the State [of Alabama] and its [agencies for monetary damages is] barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit." *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937)).

No such consent can ensue under Art. I, Sec. 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." *Id.*; *see also*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-100 (1984). Further, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is not different from a suit against the state itself." *Will v. Michigan Dep't Of State Police*, 491 U.S. 58, 71 (1989) (citation omitted).

Based upon the foregoing review, Eleventh Amendment immunity bars this lawsuit to the extent the plaintiff sues the defendants in their official capacities as employees of the Alabama Department of Corrections, a state agency. The remainder of this report and recommendation addresses the suit against the defendants in their individual capacities.

## B.     Cruel and Unusual Punishment

### 1.     General Standard

To establish an Eighth Amendment violation, a plaintiff "must prove three elements: (1) a condition of confinement that inflicted unnecessary pain or suffering [constituting cruel and unusual punishment], *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), (2) the defendant[s'] 'deliberate indifference' to that condition, *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), and (3) causation, *Williams v. Bennett*, 689 F.2d 1370, 1389-90 (11th Cir. 1982)." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (footnotes and parallel citations omitted). Whether a particular condition of confinement constituted cruel and unusual punishment constitutes an objective inquiry; whether prison officials were deliberately indifferent to that condition represents a subjective inquiry. *See Wilson*, 501 U.S. at 298.

With regard to the objective inquiry, prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes*, 452 U.S. at 347. While prison officials have a duty to furnish prisoners with "reasonably adequate food, clothing, shelter, sanitation, and

necessary medical [and mental health] attention," *Newman* [*v. State of Ala.*,] 559 F.2d [283] at 286 [(5th Cir. 1977)], *rev'd in part on other grounds*, 438 U.S. 781 (1978), "the Constitution does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349. Accordingly, "'*extreme* deprivations are required to make out a conditions-of-confinement claim' under the Eighth Amendment." *Chandler v. Crosby*, 379 F.3d 1278, 1298 (11th Cir. 2004) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). The plaintiff "'must at the very least show that a condition of his confinement poses an unreasonable risk of serious damage to his future health' or safety." *Id.* at 1289 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

As to the subjective inquiry,

> The Supreme Court says that prison officials will be liable for violating the Eighth Amendment when they are deliberately indifferent to the substantial risk of serious harm to inmates. Put differently, officials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk. *See Farmer v. Brennan,* 511 U.S. 825 (1994).

*Marsh v. Butler Cnty.,* 268 F.3d 1014, 1026-27 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (parallel citation omitted)).

## 2.   Mental Health Care

"[D]eliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds." *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990). To satisfy the objective component when the claim involves deprivation of psychiatric care, a plaintiff "must allege enough facts of prior psychiatric illness or treatment, of

expert medical opinion, or of behavior clearly evincing some psychiatric ill to create a reasonable ground to believe that psychiatric treatment is necessary for his continued health and well-being." *Woodall v. Foti*, 648 F.2d 268, 273 (5th Cir. 1981).[2] "A serious mental-health care need" may be found when medical personnel or correctional officers recognize that a prisoner is "'engag[ing] in self harm" and "show[ing] outward signs of mania and depression." *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017) (*Jacoby v. Baldwin Cnty.*, 596 F. App'x 757, 763 (11th Cir. 2014)).

> In addition to showing a serious [mental health] need [a plaintiff] must establish that [he has] been subjected to serious harm, or a substantial risk of serious harm—the second part of the 'objective' test under the Eighth Amendment jurisprudence—as a result of inadequate mental-health care. Put another way, [a] plaintiff[] must show that [his] serious [mental health] need, "if left unattended, 'poses a substantial risk of serious harm.'" *Farrow v. West*, 320 F.3d 1235, 1243 n.13 (11th Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, (1994)). Defendants may be held liable for "incarcerating prisoners under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

> The "serious harm" requirement "is concerned with both the 'severity' and the 'duration' of the prisoner's exposure" to the harm, such that an exposure to harm "which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) (citation omitted). While mere discomfort is insufficient to support liability, *id.*, "unnecessary pain or suffering" qualifies as serious harm. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993).

*Id.* (alterations supplied, parallel citations omitted).

---

[2] Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

"The knowledge of the need for [mental health] care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985) (citing *Robinson v. Moreland*, 655 F.2d 887 (8th Cir. 1981)). "'Deliberate indifference to serious [mental health] needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment.'" *Id.* (quoting *Ramos v. Lam*, 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981). Deliberate indifference "can also be found when '[a] prison official persists in a particular course of treatment in the face of resultant pain and risk of permanent injury' to the prisoner." *Bragg*, 257 F. Supp. 3d at 1171 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

### a.   Segregation Placement

### i.   Summary Judgment Facts

Upon his arrival in the prison system, Alabama Department of Corrections' ("ADOC") health care professionals placed the plaintiff "on the mental health caseload." (Doc. 1-1 at 1). The plaintiff initially declared those professionals prescribed him "Zoloft 100 mg" to treat his anxiety, depression, and suicidal thoughts, but in his opposition declares, "I have been clinically and medically diagnosed with anxiety and

severe depression.  At all times relevant, I was prescribed and was taking Celexa (20 mg)."[3]  (Doc. 1-1 at 1; Doc. 19-2 at 1). [4]

In his complaint, the plaintiff testifies he "started hearing voices" telling him to commit suicide around 7:30 p.m. on October 22, 2018.  (Doc. 1-1 at 1).  While going to his population dorm the plaintiff saw a tractor trailer, and the voices told him to get on the trailer and leap off headfirst onto the pavement.  (Id.).  Officer White noticed the plaintiff mount the trailer and shouted for him to get down.  (Id.).  Though "disoriented" the plaintiff told Officer White "he was on the mental health caseload and was having a mental health crisis and attempting suicide."  (Id.).  He requested "to see medical staff for mental health treatment or be transferred to the mental health unit."  (Doc. 19-2 at 2).

Officer White handcuffed and escorted the plaintiff to the prison's health care unit ("HCU"), "not mental health."  (Doc. 1-1 at 1).  The plaintiff admits he received a body chart in the HCU, but complains he "was not provided mental health treatment or any medical attention" and "was not given a mental health screening or an evaluation for suicidality prior to being placed in [a] disciplinary segregation cell."  (Doc. 1-1 at 1-2; Doc. 19-2 at 2, 4).  After an hour in the cell the plaintiff's "suicidal thoughts and

---

[3]  Celexa (generic Citalopram) is an antidepressant, selective serotonin reuptake inhibitor. https://www.merckmanuals.com (citing Lexi-Comp).

[4]  The plaintiff submitted a copy his handwritten sworn complaint as evidence in opposition to the motion for summary judgment.  (Doc. 19-1 at 1).  The plaintiff also filed an unsigned 4-page typed 'declaration' as evidence, (doc. 19-2); he later submitted the signature page (page 4) of the declaration, (doc. 20).

voices got stronger," so he yelled, hit, and kicked his cell door in an attempt for "Lt. Whitfield, Ofc. Donaldson or anyone" to obtain mental health assistance for him.  (*Id.*).

The plaintiff alleges defendant Estes denied him "access to the mental health ward," and/or created a policy that prescribed placement in "segregation" for inmates experiencing mental crisis issues like his "rather than [giving them] reasonable mental health treatment." (Doc. 6 at 3).  Defendant Estes denies the plaintiff's allegations and testifies the plaintiff's intoxication and non-compliant, disruptive behavior formed the basis for the decision to place him in segregation.  (*Id.*).  Estes further declares the HCU conducted an "evaluation, which included a Mental Health evaluation," the results of which cleared the plaintiff for segregation placement.  (*Id.*).

Defendant Estes' version of events comports with the record *and* the plaintiff's October 23, 2018, written statement and November 5, 2018, oral statement concerning the matter.  Specifically, Lt. Whitfield told ADOC Investigations & Intelligence ("I&I") Agent Bradley Puckett that on October 22 the plaintiff approached him while working on the trash truck.  (Doc. 15-10 at 4).  Whitfield smelled a strong odor of alcohol and asked the plaintiff if he had been drinking alcohol.  (*Id*)  In turn, the plaintiff asked Whitfield if he had been drinking alcohol.  (*Id.*).  Whitfield then ordered the plaintiff to report to the shift office.  (*Id.*).  During his interview with Agent Puckett, the plaintiff admitted corrections officers decided to place him in segregation because they smelled alcohol on him.  (Doc. 15-10 at 2).  He also admitted that "he had been drinking alcohol, but was not impaired" and "that he was served disciplinary actions for failure to obey

direct orders from ADOC personnel for refusing a drug test and for being non-compliant." (*Id.*). With regard to his mental state, the plaintiff reported in his written statement that his "depression, anxiety *start[ed]* to set in on [him]" about an "*hour or so after*" his placement in the segregation cell. (*Id.* at 5)(emphasis supplied). He also told Agent Puckett that his "depressed thinking" began an hour *after* his segregation placement and this thinking focused on his "deceased grandchild and making a mistake to get himself placed into segregation." (*Id.*).

The plaintiff's October 22, 2018, medical records read that at 7:30 p.m., Licensed Practical Nurse ("LPN") Luider assessed the plaintiff at the request of Sgt. Johnson. (Doc. 15-8 at 14). During her physical evaluation, Luider observed no injuries and the plaintiff verbalized no injury. (*Id.*). Nurse Luider also completed a "Segregation Admission Screening" form. (*Id.* at 32). The form reads, "If three or more of above questions 2-9 are marked "yes," the mental health/medical staff shall consider initiating crisis status." (*Id.*).

Questions 1 through 6 required the plaintiff's response and Luider marked "No" as the answer to the following questions:

    1. "Do you feel suicidal or feel like hurting yourself?"
    2. "Is this your first placement in segregation?"
    3. "Are you feeling sad, hopeless, or depressed?"
    4. "Have you ever intentionally hurt yourself or attempted suicide?"
    5. "Do you believe someone or something is out to get you or trying to harm you?"
    6. "Have you been assaulted (physically or sexually) by another inmate?"

(*Id.*).  Luider marked, "Yes" to question 7: "Have you had any serious  problems with a significant other, family member or friend recently?"  (*Id.*).  Questions 8 and 9 required Luider's response and she answered, "Yes" to question 8: "Does the inmate appear to be intoxicated (drugs/alcohol?)," and marked, "No" to question 9: "Is the inmate acting/talking in a strange manner?  Hearing/Seeing things that are not there? Talk doesn't make sense?"  (*Id.*).  Nurse Luider answered, "Yes" to "regular restrictive housing placement" with no special instructions.  (*Id.*).  Luider referred the plaintiff to mental health, writing "seg placement" as the sole reason for the referral in the "Mental Health Referral Form" she completed.  (*Id.* at 33).

Once the plaintiff finished in the HCU, Officers McGill and Donaldson (doc. 15-10 at 2) escorted him "to a punitive and restrictive housing unit," which contains cells with covered windows and doors and no emergency call buttons, (doc. 1-1 at 1-2). On the way to segregation, the plaintiff told Officer McGill that he "was going to 'make ya'll work today' and shook his hips causing his pants to fall to the ground.  [He] then told the officers to pick his pants up," but as he had boxer shorts on, they escorted him to the dorm with his pants down.  (Doc. 15-10 at 2).  The plaintiff saw Lt. Whitfield along the walk and told Whitfield to pick up his pants as well.  (*Id.*).

## ii.    Discussion

In his amended complaint, the plaintiff claims defendant "Warden Estes[] made the decision to deny" him "access to the mental health ward and or created a policy that prescribed for inmates experiencing similar mental crisis issues," such as plaintiff,

placement "in 'segregation' rather than [receipt of] reasonable mental health treatment." (Doc. 6 at 3).  He further claims the "defendants" knew that his "mental health condition was the reason he was placed in isolation," and they were deliberately indifferent to the crisis despite knowledge thereof.  (*Id.* at 6).  He asserts that "his behavior was clearly caused by [a] condition" that "even a lay person would have recognized."  (*Id.*).  Rather than placing him in isolation, he claims the defendants "should have referred him to a mental health professional for evaluation and treatment."  (*Id.*).

> In his opposition brief, the plaintiff claims:
>
> ADOC including, Limestone Correctional Facility, have engaged in a pattern or practice of failing to provide adequate medical care and mental health care to inmates in ADOC custody in at least the following ways:
>
> a. Placing suicidal inmates in solitary confinement/segregation units;
>
> b. Placing inmates in solitary confinement/segregation units without conducting adequate pre-screening or mental health evaluations;
>
> c. Failing to regularly monitor and perform routine check-ins with inmates on the mental health case load; *See Edward Braggs, et al., v. Jefferson F. Dunn, Commissioner of Alabama Department of Corrections*, Civil Action No. 2:14cv-601-MHT, pending in the Middle District of Alabama.

(Doc. 19 at 6).  The plaintiff attaches several documents from the *Braggs'* action, but does not explain why or how those documents are applicable to the particular facts of his *individual* case.  (Doc. 19-3 'Chart of Recent Suicides and Serious Suicide Attempt Inadequacies'; Doc. 19-4 'Interim Agreement *Braggs/Dunn*'; Doc. 19-5 'Recommendations'; Doc. 19-6 'Supplement to Recommendations.').

With the foregoing in mind, the evidence demonstrates that as of October 21, 2018, the plaintiff had a "history of major depression recurrent moderate *in remission* and antisocial personality," but no history of suicidality or auditory hallucinations. (Doc. 15-8 at 29)(emphasis supplied).  The plaintiff admits the prison's mental health professionals routinely monitored his condition and prescribed him an antidepressant, and he also admits assignment to general population and participation in work detail. (Doc. 1-1 at 1).  The plaintiff does not declare nor does the record reflect that his segregation stint(s) prior to October 21, 2018, so seriously affected his mental condition that he threatened to or did engage in self-harm.  Furthermore, other than the October 22  incident, the plaintiff remained uneventfully segregated until November 21, 2018. (Doc. 15-8 at 12, 18).  As such, the plaintiff has not established a substantial risk that he would self-harm if housed in segregation.

As for October 22, the evidence belies the plaintiff's litigation testimony as to the reason for the decision to issue a segregation order and also belies his purported need for mental health treatment or medical attention immediately prior to the placement.  The plaintiff himself told Agent Puckett he had been drinking alcohol (though not to the point of impairment), and that his alcohol consumption and refusal to submit to urinalysis precipitated the segregation order.  (Doc. 15-10 at 2, 4).  The plaintiff also gave written and verbal statements in the two weeks following October 22, in which he unequivocally reported that his depressed feeling began about an hour *after* being placed in the segregation cell while thinking about his "deceased grandchild

and making a mistake to get himself placed into segregation." (Doc. 15-10 at 2, 5). Furthermore, the plaintiff spoke to defendant Whitfield twice before entering his segregation cell, and defendant Donaldson escorted him to that cell, yet he never told either defendant he felt suicidal or depressed.

The plaintiff's assertion that he did not receive mental health screening or an evaluation for suicidality prior to placement in the disciplinary segregation cell appears for the first time in his opposition testimony. (Doc. 19 at 2, 6). However, the contemporaneous medical record portrays Nurse Luider conducted a physical and mental health evaluation and cleared the plaintiff for segregation housing based on her observations and his answers to questions set out in the Segregation Admission Screening form. (Doc. 15-8 at 14, 32-33). Thus, the plaintiff's statement to the contrary fails to "create a question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010)(citing *Bennett v. Parker,* 898 F.2d 1530 (11th Cir. 1990)).

The plaintiff fails to establish a genuine issue of material fact regarding his Eighth Amendment claim that the defendants violated his right to mental health care when directing his placement in segregation. No "fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252. Accordingly, the defendants' motion for summary judgment is due to be granted and this claim is due to be dismissed with prejudice.

16

### b.      October 22 Mental Health Crisis in Segregation Cell

The plaintiff claims Donaldson and Whitfield displayed deliberate indifference to his serious mental health crisis because they observed him threatening to take his life in his segregation cell, encouraged him to do so, and continued to confine him in that cell.  (Doc. 19 at 7).

### i.      Summary Judgment Facts[5]

The plaintiff testifies Officer Donaldson responded to his noise-making in about 15 minutes, and Donaldson called Lt. Whitfield when the plaintiff told him of his suicidal thoughts and need for medical attention.  (Doc. 1-1 at 2).[6]  The plaintiff attests he had tied a sock or sheet around his neck and to the bed by the time Whitfield arrived and handcuffed him behind his back, (*id.*), but defendant Donaldson testifies that he and Officer McGill handcuffed the plaintiff *before* Lt. Whitfield entered the dorm around 9:30 p.m.  (Doc. 15-3 at 1; Doc. 15-4 at 1; Doc. 15-10 at 3).  Officer McGill told Agent Puckett that "he was present for the entire event," that he and Donaldson handcuffed

---

[5] The plaintiff proclaims the defendants' special report and supporting evidence "are solely self-serving" and contradictory, as set out in the argument underlying his motion to strike the October 22, 2019, post-assault body chart.  *See infra*, n.8.    However, "[c]ourts routinely and properly [grant] summary judgment on the basis of a party's sworn testimony even though it is self-serving," *Price v. Time, Inc.,* 416 F.3d 1327, 1345 (11th Cir. 2005), unless it is blatantly contradicted by the record," *Scott*, 550 U.S. at 380.  While the defendants' evidence may be self-serving, it is not blatantly contradicted by the record.  *See infra*, n. 9.

[6] The plaintiff gave similar representations in writing and verbally in the two weeks following the event.  (Doc. 15-10 at 2, 5).  Contrastingly, in a declaration submitted with his summary judgment opposition the plaintiff contradicts all of the previous testimony and verbal and written statements on this point; he attests no one responded to his initial banging.  (Doc. 19-2 at 7).

the plaintiff prior to Whitfield's arrival, and that the plaintiff "never tied anything around his neck or made any actions to harm himself, although he threatened to do so." (Doc. 15-10 at 3).

In any event, the 5' 10," 165-pound plaintiff attests the 6' 2", 300-pound Whitfield handcuffed him, removed the object from his neck, and then threw him "into the wall and onto the cell floor," and said, "'Try to kill yourself now'" as he walked out of the cell. (Doc. 1-1 at 2-3; Doc. 15-11 at 2). The plaintiff got up, kicked, and hit his head on the cell door begging for help; the resulting disorientation caused him to end up on the cell floor. (Doc. 1-1 at 3). Whitfield returned a few moments later, motioned for Donaldson to reopen the cell door, and stood over the plaintiff as he lay motionless on the floor. (*Id.*). Enraged, Whitfield grabbed at the handcuffed plaintiff, and every time he did so he "ripped" and "snatched" off a piece of the plaintiff's clothes. (Doc. 15-10 at 2, 6). Whitfield "reached down and violently grabbed" the plaintiff's penis and testicles, and proceeded to spray his face, body, and genitalia with chemical mace. (Doc. 1-1 at 3). Whitfield left stating, "'You think you crazy, I'm crazy. I'll be back in two minutes, you can die bitch.'" (*Id.*). Around this time "other inmates began to scream for assistance." (*Id.* at 4). During the assault Donaldson stood in the doorway of the cell and did not intervene. (Doc. 19-2 at 5).[7]

---

[7] Inmate Bobby Bishop occupied a cell near the plaintiff on the day of the incident. (Doc. 1-1 at 7). Bishop declares he heard the plaintiff screaming and hollering that he had attempted suicide and needed help. (*Id.*). Bishop also "heard a lot of commotion going on during the time" the plaintiff

According to the defendants' evidence, Whitfield responded to Donaldson's report that the plaintiff "was acting belligerent due to being intoxicated." (Doc. 15-10 at 3). He asked the plaintiff to explain his behavior "and if he was still drunk," to which the plaintiff responded, "this is wrong and I'm going to harm myself." (Doc. 15-2 at 2). Whitfield ordered the plaintiff to sit on his bed and stated he would notify the health care unit ("HCU") to send a nurse, to which the plaintiff responded, "you don't believe that I will hurt myself?" (Doc. 15-2 at 2). Whitfield directed Officer McGill to open the cell door and removed the plaintiff's clothes because of "the totality of the circumstances" and threat of self-harm. (*Id.*). He asked the plaintiff to stop threatening self-harm and allow him to call a nurse. (*Id.*).

Donaldson testifies that he stood outside of the cell "and off to the side" when Lt. Whitfield entered the dorm and instructed the plaintiff to sit on his bed. (Doc. 15-3 at 1). Donaldson did not observe Whitfield in the cell, but did overhear the plaintiff "say something about harming himself," witnessed "clothing thrown from the cell," and saw Whitfield exit the cell and secure it behind him. (*Id.*). Officer McGill told Agent Puckett that Whitfield did not remove the plaintiff's cuffs and ripped the plaintiff's t-shirt to remove it. (Doc. 15-10 at 3).

---

"was sprayed." (*Id.*). He declares "the[y]" wrapped the plaintiff in a sheet, dragged him out of the cell and told the runner to get "his ass out of here." (*Id.*).

Whitfield attests he exited the cell and shut the door to speak with McGill and Donaldson and to notify the HCU.  (Doc. 15-2 at 2).  He claims Officers McGill and Donaldson "observed" the plaintiff "get up from his bed, ram his head on the bed rail, [and] then began kicking the walls and the cell door."  (*Id.* at 1).  Whitfield peered in the cell window and ordered the plaintiff to stop his "self-harming behavior" as the plaintiff "fell back to the floor in an attempt to jump his handcuffs."  (Doc. 15-2 at 1; Doc. 15-10 at 3).

Donaldson attests he heard the plaintiff banging and Whitfield advised him the plaintiff "was trying to slip his cuffs."  (Doc. 15-3 at 1-2).  Whitfield ordered Donaldson to open the door, yelled "'gas,'" and administered a one (1) second burst to the plaintiff's face.  (Doc. 15-2 at 1).  Donaldson declares he "stood behind" Whitfield "outside the cell" during this time and did not observe Whitfield "engage physically with" the plaintiff.  (Doc. 15-3 at 1-2).  Officer McGill told Agent Puckett that Whitfield directed the chemical spray toward the plaintiff's face and that Whitfield did not push, strike, or act excessively toward the plaintiff.  (Doc. 15-10 at 3).

Donaldson could smell Sabre Red and see a red substance on the plaintiff's face when he and McGill entered the cell.  (Doc. 15-3 at 2).  Though told to do so, the plaintiff did not stand or walk to assist Donaldson and McGill for escort.  (*Id.*).  Whitfield called for a wheelchair, Donaldson helped the plaintiff into it, and then placed a blanket over him for escort to the HCU.  (*Id.*).  Inmate Charlie Harris brought the

HCU wheelchair and picked the sheet-covered plaintiff up because the plaintiff said he "could not move, but could walk." (Doc. 15-10 at 2).

The plaintiff testifies Whitfield "had sprayed so much mace on [him] that the nurses had to use milk before [he] was allowed to take a shower." (Doc. 1-1 at 4). In the plaintiff's 10:10 p.m. body chart, the nurse wrote, "pepper spray on face/head" with "skin intact." (Doc. 15-8 at 13). The nurse recorded the plaintiff as saying, "It burns," and that he smelled like alcohol and was "drunk/nonverbal." (*Id.*).[8] The plaintiff attests he told the treating nurses about the assault. (Doc. 19-2 at 5). Inmate Harris described the plaintiff as "'out of it'" and stated he had to help the plaintiff shower and dress himself. (Doc. 15-10 at 2). Once dressed Lt. Whitfield instructed the plaintiff to stand against a wall to be photographed. (Doc. 15-10 at 7).

---

[8] The plaintiff moves to strike the body chart because it does not reflect the infliction of a head injury, which contradicts his assertions (in his complaint and opposition declaration) and Defendant Whitfield's statement "under Oath that [plaintiff's] head was rammed into a steel bed rail and concrete wall" multiple times. (Doc. 19 at 8). Plaintiff contends the parties agree on these facts (*id.*), as defendant Whitfield testified that defendant Donaldson and Officer McGill "observed" the plaintiff "get up from his bed, ram his head on the bed rail, [and] then began kicking the walls and the cell door." (Doc. 15-2 at 1). This court's task at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Without any additional evidence discrediting the veracity of the chart on this point, striking the affidavit represents an improper weighing of the evidence.

The plaintiff also moves to strike the October 22, 2018, post-assault body chart as unreliable because it does not evidence the excessive chemical mace on his body. (Doc. 19 at 10). As recounted previously, the defendants' testimony and Officer McGill's report dispute whether Whitfield deployed mace on plaintiff's body. (Doc. 15-2 at 1; Doc. 15-3 at 2; Doc. 15-10 at 1). Again, at this stage the court should not "weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249. The motion to strike is due to be DENIED.

Thereafter, Whitfield returned the plaintiff to segregation where he waited several hours for the mental health worker to make rounds and assist him with "making a [Prison Rape Elimination Act] PREA complaint and providing further notice of [his] mental health crisis." (Doc. 19-2 at 4). Mental Health Professional ("MHP") Montori Graham conducted the initial mental health assessment. (Doc. 15-8 at 34). On the "Segregation: Mental Health Assessment/Report" Graham completed, the plaintiff answered, "No" when asked if he had "current thoughts of suicide or pain," a "[h]istory of suicide attempts/behaviors," or a "current mental health complaint." (*Id.*). He did report a history of outpatient mental health treatment and a current prescription for psychotropic medication. (*Id.*). Graham assessed the plaintiff as "calm, cooperative," and "willing to engage in" the session. (*Id.* at 35). He observed no signs of acute distress and the plaintiff denied homicidal or suicidal ideations. (*Id.*). Graham found the plaintiff was adjusting to the dormitory and made no mental health referral. (*Id.*).

Around 3:45 p.m. on October 23, Graham informed Lt. Coady, the Prison Rape Elimination Act ("PREA") Compliance Manager, that the plaintiff wished to speak to him about staff sexual misconduct. (Doc. 15-6 at 1). At 4:30 p.m., Lt. Coady interviewed the plaintiff, and at 4:45 p.m., Lt. Coady escorted the plaintiff to the infirmary for a body chart, where the plaintiff told the nurse, "I got sprayed and my genitals were grabbed." (Doc. 15-7 at 2; Doc. 15-10 at 1). Upon evaluation, the nurse observed "no marks, cuts, bruising, swelling, redness, or visible injuries of any kind,

including on genital area, or neck." (*Id.*). At Lt. Coady's request, the plaintiff provided the handwritten statement concerning the incident. (Doc. 15-6 at 1; Doc. 15-10 at 1, 5-7).

At 8:00 a.m. on October 24, 2018, Lt. Coady completed a "Mental Health Referral Form," writing "PREA related" as the reason for the referral. (Doc. 15-9 at 1). Around 2:00 p.m. on October 26, 2018, the plaintiff consented to the "Sexual Abuse Allegation Evaluation" MHP Graham performed. (Doc. 15-8 at 28-31). Graham noted the plaintiff's diagnosis of adjustment disorder with mixed features. (*Id.* at 29). Graham also reported the plaintiff had a "history of major depression recurrent moderate in remission and antisocial personality" disorder. (*Id.*). The plaintiff reported feeling abused, stressed, and anxious because staff sprayed him in the genitals. (*Id.* at 31). The plaintiff denied homicidal or suicidal ideation, but feared staff and believed he needed to be watched until the situation cleared over. (*Id.*). Graham found the plaintiff anxious and tense and planned to see the plaintiff bi-weekly in restrictive housing. (*Id.*).

The plaintiff attests that when his "Mental Health Supervisor Mr. Bailey returned to work," he immediately ordered the plaintiff "removed to mental health observation." (Doc. 1-1 at 4). The medical record depicts the plaintiff's placement in an HCU isolation cell for mental health observation at 8:30 p.m. on October 26; around 9:00 p.m., Registered Nurse Debbie Buns physically and mentally assessed the plaintiff. (Doc. 15-8 at 10, 20, 25, 27). The plaintiff provided "Yes" answers to two "Segregation Admission Screening" questions. (*Id.* at 20, 27) ("Are you feeling sad, hopeless, or

23

depressed?" and "Do you believe someone or something is out to get you or trying to harm you?"). The plaintiff answered "No" to the remaining questions posed to him, including questions 1 and 4: "Do you feel suicidal or like hurting yourself?" and "Have you ever intentionally hurt yourself or attempted suicide?" (*Id.*).

While in the crisis cell, mental health professionals observed the plaintiff every 30 minutes. (*Id.* at 19, 21-25). Throughout his stay, the plaintiff was quiet, calm, and relaxed. (*Id.*). Dr. Sheikholeslamer ordered his discharge at 1:30 p.m. on October 29, 2019. Immediately prior to his discharge the plaintiff consulted with Licensed Mental Health Social Worker Shirlene Briggs. (*Id.* at 19). The plaintiff informed Ms. Briggs of improvement in his anxiety symptoms; denied suicidal ideations, auditory or visual hallucinations; and reported no new problems. (*Id.*). On November 6, 2018, the plaintiff filed a mental health slip requesting to see Dr. Sheikholeslamer due to difficulty sleeping because of Lt. Whitfield's actions. (*Id.* at 18). He claimed his anxiety and depression had worsened. (*Id.*). Personnel scheduled a mental health appointment for November 14, 2018. (*Id.*).

On November 15 and 28, 2018, medical professionals provided the plaintiff eczema treatment for his feet and hand. (*Id.* at 15, 17). On November 29, 2018, he requested a refill of Tylenol for old lower back pain and requested TUMS until he received his prescription Prilosec. (*Id.* at 16).

The plaintiff declares the defendants' actions caused the skin in his genital area to burn off and he continued to have soreness, burning sensations and numbness in the

area for six months following the incident.  (Doc. 19-2 at 5).  He also suffered from burning and irritated eyes, contusions to his head, wrist and torso, bruising to his legs and neck, headaches and difficulty sleeping, and increased anxiety and panic attacks. (*Id.*).

### ii.    Discussion

Construing the facts in a light most favorable to the plaintiff, about one (1) hour after his cell placement, he began having suicidal feelings, which he acted upon by beating on his cell door to obtain the attention of corrections officers.  (Doc. 1-1 at 2-3).  A short time later and around 9:30 p.m., Donaldson responded to the plaintiff's noisemaking; by 10:10 p.m. HCU Nurse Keinast had assessed the plaintiff.  (Doc. 15-2 at 1; Doc. 15-7 at 1).  The plaintiff told the nurses about "the assault" (doc. 19-2 at 5), but does not declare he felt suicidal in the HCU or that he informed the nurses of such.

A few hours after returning to his segregation cell, a calm, cooperative plaintiff told MHP Graham that he did not feel suicidal and had no current mental health complaint.  (Doc. 15-8 at 34).  On October 26, 2018, the plaintiff reported feeling anxious and depressed, feared staff because of the incident, and believed he needed "to be watched until the situation is cleared over," so Mr. Bailey placed him under mental health observation, where he stayed quietly and calmly until his discharge back to segregation three (3) days later.  (Doc. 1-1 at 3; Doc. 15-8 at 10, 19-25, 27, 31).  The plaintiff filed one (1) mental health request on November 6 for anxiety and depression,

received an appointment on November 14, and officials released him from segregation on November 21, 2018.   (Doc. 15-8 at 12, 18).

The defendants admit the plaintiff told them he intended to harm himself and repeatedly banged on his cell door.  (Doc. 15-2 at 1; Doc. 15-3 at 1).  The plaintiff attests he also engaged in self-injurious behavior by tying an object around his neck, but does not attest that he actually choked himself or that he had any neck injury.   (Doc. 1-1 at 2-3).  Nonetheless, viewing his version of the facts in a light most favorable to him, the plaintiff's verbal and physical display between 9:30 and 10:10 p.m. on October 22 sufficiently establish an objectively serious mental health need.

Nonetheless, "[a] constitutional violation occurs only when a plaintiff establishes the existence of a substantial risk of serious harm, of which the official is subjectively aware, ... and the official does not respond[ ] reasonably to the risk." *Melton v. Abston*, 841 F.3d 1207, 1233(citations omitted), *abrogated on other grounds by Bell Atl. Corp*, 550 U.S. at 561-63).  "[P]rison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care." *Waldrop v. Evans*, 871 F.3d 1030, 1036 (11th Cir. 1989(citing *Estelle v. Gamble*, 429 U.S. 97,  104–05 (1976)).

The plaintiff argues the defendants exhibited deliberate indifference to his serious mental health need because defendant Whitfield taunted him and neither defendant removed him from the segregation cell.  The undersigned does not commend Whitfield's harsh words, but no matter how repugnant or unprofessional, verbal abuse

alone cannot state an actionable Eighth Amendment claim.  *See Berry v. Greer*, No. 1:19-cv-260-WHA, 2019 WL 2251839 at *2 (M.D. Ala. May 3, 2019) (citing *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x. 862, 866 (11th Cir. 2008), and numerous Court of Appeals' decisions).

The material question is whether the defendants failed to take action or provide medical attention despite knowledge of a substantial risk that the plaintiff would self-harm if they did not.  The undisputed evidence demonstrates the defendants took action and provided the plaintiff access to care.  Once notified of his suicidal ideations, neither defendant left the plaintiff unattended. (Doc. 1-1 at 2-3). Instead, the defendants immediately gained entry to the cell, and defendant Whitfield diffused the known risk by removing the object from the plaintiff's neck and cuffing his hands behind his back. (*Id.*).  Furthermore, when the handcuffed plaintiff stood up, banged on his cell door crying for help, and fell back on the floor, the defendants immediately regained entry to the cell and thwarted any additional potential for self-harm by stripping his clothes off and utilizing chemical spray.  (*Id.*).  Thereafter, the defendants provided the plaintiff a wheelchair escort to the HCU.  (Doc. 15-3 at 2).  Given the rapidly changing circumstances and the time period involved, the defendants did not demonstrate deliberate indifference to the plaintiff's serious medical need.  Finally, the plaintiff did not successfully harm himself and as such, he has failed to establish the causation element of the claim.

To the extent the plaintiff declares Lt. Whitfield exhibited deliberate indifference to a serious mental health need by ordering him to return to his cell after the incident, he also failed to create a genuine dispute justifying denial of the defendants' motion for summary judgment. The plaintiff does not declare that he felt suicidal in the HCU nor does he attest that he informed the nurse he felt suicidal. Just a few hours after returning to his segregation cell, the plaintiff told MHP Graham that he did not feel depressed or suicidal and had no current mental health problems. (Doc. 15-8 at 34-35). The plaintiff has repeatedly represented to mental health professionals before and after the event that he has never attempted suicide or self-harm. (*Id.* at 20, 27, 31-32). Finally, the plaintiff remained in segregation for a month after the incident with no indication of suicidality or self-harm, and when he expressed fear of staff over the incident itself, mental health professionals placed him under observation for three days, where he remained calm. (Id. at 20, 25, 27). Accordingly, the defendants' motion for summary judgment as to this claim is due to be granted and the claim dismissed with prejudice.

## C. Excessive Force

### 1. Qualified Immunity

Defendants Whitfield and Donaldson assert the affirmative defense of qualified immunity in connection with plaintiff's Eighth Amendment excessive force claim. (Doc. 15). However,

> [i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is

clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* [*v. McMillian*, 503 U.S. 1 (1992)] and *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]. *See Johnson. v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002). There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. *Id.* The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002).

## 2.   Standard

The Eighth Amendment's Cruel and Unusual Punishments Clause governs the plaintiff's excessive force claim against defendants Whitfield and Donaldson. The Eighth Amendment prohibition against cruel and unusual punishment arises when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the

adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 321-22).

"The use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich*, 280 F.3d 1295, 1304 (11th Cir. 2002) (citing *Whitley*, 475 at 320-21). Therefore, if a non-compliant inmate has been restrained by guards and no longer poses a threat, he "cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain." (*Id.*).

With these concerns in mind, the Supreme Court set out certain factors that courts should when evaluating whether force was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Id.* at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986).

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (internal citations omitted).

Finally, it is well established that a prison official need not

"actually participate in the use of excessive force in order to be held
liable under section 1983. Rather, an [official] who is present at the
scene and who fails to take reasonable steps to protect the victim of
another [official's] use of excessive force, can be held liable for his
nonfeasance."

*Skrtich v. Thornton*, 280 F.3d at 1302 (quoting *Fundiller v. City of Cooper City*, 777 F.2d

1436, 1441-42 (11th Cir. 1985)). "But it must also be true that the non-intervening

officer was in a position to intervene yet failed to do so." *Hadley v. Gutierrez*, 526 F.3d

1324, 1330-1331 (11th Cir. 2008) (citing *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919,

924 (11th Cir. 2000)).

### 3.    Summary Judgment Facts

The undersigned reviewed the summary judgment facts pertinent to the

plaintiff's excessive force claim against defendants Donaldson and Whitfield in Section

III.B.2.b.i., *supra*.

### 4.    Discussion

Applying the *Whitley* factors to the material facts and inferences, and take the

evidence in the light most favorable to plaintiff, the plaintiff posed no threat to

defendants Donaldson and Whitfield nor could the defendants have reasonably

perceived a threat. While the defendants needed to apply force in connection with

plaintiff's threats of self-harm, the remaining excessive force factors weigh in the

plaintiff's favor. An angry, taunting Whitfield utilized a disproportionate amount of

force when handling the much smaller, handcuffed plaintiff.  Furthermore, Whitfield's rough grabbing of the naked plaintiff's genitals and use of chemical spray from head to genitals does appear disproportionate to the prevention of self-harm.  Finally, defendant Donaldson watched the events unfold and did intervene to assist the plaintiff.

As for the final factor, the parties dispute the extent of the plaintiff's injuries. Notwithstanding that dispute, "[t]he 'core judicial inquiry'" is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7).  Taking the facts in the light most favorable to plaintiff, a reasonable jury could determine that Whitfield used force against the plaintiff out of malice, not good-faith, and that Donaldson had ample opportunity to intervene in the plaintiff's behalf, but refused to do so.  Accordingly, the motion for summary judgment filed by Whitfield and Donaldson as to the plaintiff's excessive force claim is due to be denied.

## V. Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** the court **GRANT** the motion for summary judgment filed by defendant Estes.  The undersigned **FURTHER RECOMMENDS** the court **GRANT** the motion for summary judgment filed by defendants Whitfield and Donaldson as to the plaintiff's claim of deliberate indifference to his serious mental health needs and **DENY** it as to his claim of excessive force.  Finally, the undersigned **FURTHER RECOMMENDS** the court

**REFER** the plaintiff's excessive force claims against defendants Whitfield and Donaldson to him for additional proceedings.

## VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation. A party must file any objections with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or repeat legal arguments. An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order. In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice. 11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations. The district judge must conduct a hearing if required by law.

Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

**DONE** this 29th day of January, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE